**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| ALABAMA AIRCRAFT INDUSTRIES, INC., | ) Case No. 11-10452 (PJW) |
| *et al.*,[1] | ) |
| | ) Joint Administration Pending |
| Debtors. | ) |

**DECLARATION OF RANDALL C. SHEALY IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Randall C. Shealy, declare and state as follows:

## I.     GENERAL BACKGROUND

1.     I am the Senior Vice President and Chief Financial Officer of Alabama Aircraft Industries, Inc., a Delaware corporation ("**AAII**"), the Chief Financial Officer and Treasurer of Alabama Aircraft Industries, Inc.—Birmingham, an Alabama Corporation ("**AAII—Birmingham**") and the Chief Financial Officer and Treasurer of Pemco Aircraft Engineering Services, Inc., a Delaware Corporation ("**Pemco**," and together with AAII and AAII—Birmingham, the "**Debtors**"). I have been employed by the Debtors since 2004 and I am familiar with the day-to-day operations, businesses, and financial affairs of the Debtors.

2.     I submit this Declaration in support of the Debtors' petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), and the Debtors' First Day Motions (as defined below). I am authorized to submit this Declaration on behalf of the Debtors.

---

[1]   The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis: (i) Alabama Aircraft Industries, Inc. (5295); (ii) Alabama Aircraft Industries, Inc.-Birmingham (6533); and (iii) Pemco Aircraft Engineering Services, Inc. (9969). The mailing address for all of the Debtors is 1943 50th Street North, Birmingham, AL 35212.

3. Upon commencement of these Chapter 11 cases (the "**Bankruptcy Cases**"), the Debtors will continue to operate as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4. I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these Bankruptcy Cases, and in support of the First Day Motions.

5. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' business operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of the documents or opinion.

## II. OVERVIEW OF THE DEBTORS' BUSINESSES

### A. The Debtors' Formation

6. AAII—Birmingham, formerly known as Pemco Aeroplex, Inc., was originally established in Birmingham, Alabama as Hayes International Corporation in 1951. Founded to service aircraft for the U.S. armed forces following World War II, AAII—Birmingham, and its subsequently formed parent corporation AAII, formerly known as Pemco Aviation Group, Inc., have provided aircraft maintenance and modification services for government and military customers for nearly sixty (60) years.

### B. The Debtors' Operations

7. The Debtors are an aerospace and defense company whose primary business is providing aircraft maintenance and modification services to the U.S. Government, including complete airframe inspection, maintenance, repair and custom airframe design and modification.

The Debtors specialize in providing programmed depot maintenance ("**PDM**") on large transport, tanker and patrol aircraft, such as the C-130 "Hercules" transport aircraft, the KC-135 refueling aircraft and the P-3 patrol aircraft. In addition to PDM, the Debtors provide various other repair, maintenance and modification services, including helicopter maintenance, aircraft stripping and painting, rewiring, parts fabrication and engineering support. The Debtors completed work on one (1) C-130 immediately prior to the commencement of the Bankruptcy Cases and, currently, the Debtors have one (1) C-130, five (5) KC-135s and two (2) P-3s on-site. The Debtors' continued operations will ensure that these U.S. military assets are promptly returned to service.

8.    The Debtors' contracts are generally multi-aircraft programs with various branches of the U.S. armed forces (the "**Armed Forces**"), and certain foreign military services through relationships with the Armed Forces, lasting several years whereby the Debtors serve either directly as a prime contractor or indirectly as a subcontractor. Since 2007, the Debtors have officially qualified with the Small Business Association as a small business for military contracts, providing AAII with vital opportunities to obtain defense contracts that may not otherwise be available.

9.    The principal services performed under the Armed Forces contracts, the PDM, include systems integration of component upgrades and modification of fixed wing aircraft. This is the most thorough scheduled maintenance check-up for a military aircraft, entailing a bolt-by-bolt, wire-by-wire and section-by-section examination of the entire aircraft. The typical PDM program involves a nose-to-tail inspection and repair program on a four or five year cycle.

10.   In addition to heavy maintenance, the program can include airframe corrosion prevention control, rewiring, component overhauls, and structural, avionics and various other

system modifications. In order for the Debtors to efficiently complete their maintenance procedures, they maintain hydraulic, electrical, sheet metal and machine shops to satisfy all of their testing and assembly needs and to fabricate, repair and restore parts and components for structural aircraft repairs. The Debtors also perform in-house heat treatment on alloys used in aircraft modifications and repairs and have complete, non-destructive testing capabilities and test laboratories.

11.     For nearly sixty (60) years, the Debtors have provided quality maintenance, integration and modification work on a wide variety of military aircraft including the C-130, KC-135, C-9, P-3, T-34, A-10, F-4, F-15, F-16, T-38 and U.S. Navy H-2 and H-3 helicopters.

### C.     The Debtors' Facility

12.     The Debtors' facility, including their corporate offices, is located at the Birmingham International Airport in Birmingham, Alabama. The facility is located on 190 acres of land with approximately 1.9 million square feet of production and administrative floor space and includes ten flow-through bays permitting continual production line operation. The facility also includes a number of ancillary buildings including a paint hangar, a shipping and receiving warehouse, a wing rehabilitation shop, a sheet metal shop and a 55,000 square foot general office building. The facility, an FAA approved repair station, is a complete aircraft modification and maintenance center and maintains a Department of Defense "SECRET" security clearance.

13.     Additionally, the facility operates a control tower to supplement the FAA-managed municipal air control tower for handling aircraft on the Debtors' property and a fire-fighting unit to supplement the fire-fighting services of the City of Birmingham and the Alabama National Guard. The Debtors are party to a mutual aid agreement with the Birmingham Fire and Rescue and the Alabama National Guard for fire prevention and hazardous materials incident

4

response capabilities.

14. The facility, originally built by the U.S. government as an aircraft modification plant during World War II, is leased to the Debtors by the Birmingham Airport Authority pursuant to that certain lease dated January 1, 1957, as amended on November 4, 2010 (the "**Lease**"), which expires on September 30, 2029.

### D.    Market for the Debtors' Services

15. The maintenance and modification of military transport aircraft is one segment of a worldwide military maintenance, repair and overhaul market that includes depot level maintenance for airframe, engines and components. Military aircraft operators continue to face pressure to lower operating costs, but given the aging of military transport aircraft fleets together with budget restrictions for the acquisition of new aircraft, the segment of the market served by the Debtors has suffered only limited impact as a result of defense budget cuts.

16. Instead, fierce competition by larger PDM providers such as The Boeing Company and Boeing LSS (together "**Boeing**"), Lockheed-Martin Aircraft and Logistics Center ("**Lockheed-Martin**") and L-3 Communications ("**L-3**"), has resulted in a decrease in the demand for the Debtors' services.

17. Though the Debtors are subcontractors on a number of Armed Forces contracts for Boeing, Lockheed-Martin and L-3, the revenues from the Debtors' existing contracts are insufficient to fund the Debtors' ongoing expenses, including their pension plan liabilities, described in detail below.

### E.    The Debtors' Contracts

18. The Debtors are currently prime contractors or subcontractors on contracts with the U.S. Air Force and the U.S. Navy. Though military contracts generally specify a certain

number of aircraft to be serviced for the duration of the program, the Armed Forces frequently increase this number with aircraft that were not scheduled for PDM, but require servicing nevertheless. These "drop-in" aircraft, on which unscheduled depot level maintenance ("**UDLM**") is required, increase the value of each contract.

19. <u>The KC-135 PDM Contract</u>. The KC-135 PDM program had comprised 83% of the Debtors' total revenues from continuing operations in 2008 and 2009 and 69% of the Debtors' total revenues in the first nine months of 2010. An example of the competition faced by the Debtors, the Debtors lost the bid for the KC-135 PDM contract to Boeing in September 2007. The Debtors believed that the U.S. Air Force's (the "**USAF**") award of this contract to Boeing was without proper analysis of Boeing's proposal in violation of applicable standards and the Debtors filed a protest with the Government Accountability Office (the "**GAO**"), commencing nearly three (3) years of litigation between the Debtors, Boeing and the USAF. Though the protest was initially successful, the Debtors were not ultimately awarded the KC-135 PDM contract and, as a result, filed a complaint in the United States Court of Federal Claims protesting the USAF's actions in connection with the award to Boeing of the KC-135 PDM contract. The Court of Federal Claims set aside the contract award to Boeing, but was overturned on appeal by the U.S. Court of Appeals for the Federal Circuit. Though the Debtors remain a subcontractor to Boeing on the KC-135 PDM program, all remaining KC-135 PDM work is expected to be completed during the first quarter of 2011.

20. <u>C-130 Depaint Contract</u>. On November 1, 2010, the Debtors were awarded a contract from the USAF to perform de-paint and safety of flight repairs on various USAF and U.S. Navy C-130 aircraft. The contract currently expires on October 31, 2011.

21.     F2AST Contract.  The Debtors are a subcontractor on nine (9) of twelve (12) teams providing services under the Future Flexible Acquisition and Sustainment Tool ("**F2AST**"), a program for acquiring contractor support for Warner Robins Air Logistics Center, a military depot.  Through F2AST, and Lockheed-Martin Integrated Systems, one of the prime contractors, the Debtors currently operate two delivery orders: (1) The Debtors provide Romania Avionics Upgrade Modifications to USAF contracted; foreign government owned C-130 aircraft and (2) the Debtors provide training for removal and replacement of rainbow and corner fittings for Iraqi Air Force C-130 aircraft in Jordan.

22.     P-3 Contract.  On November 4, 2005, the Debtors were awarded a subcontract from L-3 Communications to perform work under the US Navy's P-3 sustainment, Modification and Installation Program ("**SMIP**").  The P-3 contract expires in 2011.

23.     SbAST Contract.  The Small Business Acquisition and Sustainment Tool ("**SbAST**") is a small business set aside program for acquiring contractor support for Warner Robins Air Logistics Center, a military depot.  The Debtors are among six prime contractors for the SbAST program, which has a ceiling amount of $402 million.  The Debtors are in the process of formulating a proposal for the first effort under this contract, the installation of Mode S upgrades on various model design series ("**MDS**") C-130 aircraft.

24.     H60 Contract.  On October 28, 2010, the Debtors were awarded a contract to manufacture various H-60 structural components for Defense Support Services ("**DS2**").  The H60 contract currently expires in 2011.

**F.      The Debtors' Workforce**

25.     The Debtors' highly skilled workforce is currently comprised of ninety-two (92) salaried employees and two hundred thirty-four (234) hourly employees.  Also, the Debtors

previously employed two hundred fifty-one (251) inactive, hourly employees, who have been furloughed since January 1, 2010. In addition to the furloughed employees, approximately 30 former employees have been laid off or otherwise terminated during the past twelve (12) months. The majority of the Debtors' hourly employees have been employed by the Debtors for over thirty (30) years. In addition to their active and inactive employees, the Debtors have two thousand one hundred seventy-three (2,173) retirees.

26.     Over 90% of the Debtors' active, hourly employees and 74% of the Debtors' retirees are members of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "**UAW**"), Region 8, Local 1155.

### G.     The Collective Bargaining Agreement and the Defined Benefit Pension Plan

27.     The Debtors and the UAW and its Local 1155 are parties to that certain collective bargaining agreement dated March 21, 2005, as amended in March 2010 (the "**CBA**"). Pursuant to Article XVI, Section 11 of the CBA, the Debtors are required to maintain the amended and restated Alabama Aircraft Industries, Inc. – Birmingham Pension Plan dated January 27, 2009 (the "**Pension Plan**").

28.     With approximately 3,000 Pension Plan participants, the Debtors' current, required Pension Plan contributions are in excess of $5.7 million per year. Due to the Debtors' decreased revenues, the Debtors have been, and continue to be, unable to fund all of their Pension Plan Obligations.

29.     The Debtors contributed approximately $3.9 million to the Pension Plan in 2008 and $3.2 million in 2009. The Debtors made contributions of approximately $2 million during the first half of 2010, but did not make the minimum required quarterly contributions to the Pension Plan on July 15, 2010, October 15, 2010, or January 15, 2011. The Pension Plan was

8

underfunded by approximately $31,485,533 million at December 31, 2010 (following under funding of approximately $29.4 million in 2009 and $33.1 million in 2008). Though this shortfall is due, in part, to inconsistent investment returns and an increase in actuarial liability resulting from lower interest rates and increased mortality rates, the inability of the Debtors to make required minimum funding contributions have also had a significant impact on the funding status of the Pension Plan. As such, the terms of the CBA guarantee that the Debtors will be unable to meet their obligations under the Pension Plan on a forward looking basis.

30.     The Debtors froze the Pension Plan effective December 31, 2007, for all non-UAW employees, but despite continued negotiations with the UAW—and the reality that the Debtors do not have revenues sufficient to satisfy the Pension Plan obligations— the UAW has been unwilling to voluntarily modify the CBA to provide the Debtors with any relief of their Pension Plan obligations.

31.     The Debtors commenced formal discussions with the UAW regarding the CBA and the Pension Plan in January 2010. At that time, the UAW requested a three (3) year extension on the CBA from the Debtors, in response to which the Debtors proposed the extension of the CBA through March 21, 2013, provided that: (A) current employees would receive (i) no annual wage increase or changes in the terms and conditions of the CBA during the extension, (ii) cost of living adjustments ("**COLA**") pursuant to Article XV, Section 6, Page 72 of the CBA, (iii) automatic progress from minimum to maximum benefits, (iv) continued longevity accruals and (v) medical plan coverage at the levels then provided, which includes full coverage at no cost to the employee for employees hired prior to March 21, 2005, and an employee contribution not to exceed $100 for full family coverage for all other employees; and (B) employees with a start date of February 7, 2010, or later would receive (i) no participation in

the Pension Plan, but the option of participating in the Debtors' 401(k) plan with the Debtors matching 50% of the first 6% of the employee's salary contributed, (ii) participation in the Debtors' salaried employee medical plan, which requires employee contributions and (iii) the freezing of employee medical plan contribution levels for three years at $45 per month (employee only), $90 per month (employee plus one) or $120 per month (employee plus family), as applicable. The UAW accepted the Debtors' proposal and the CBA was extended accordingly on March 22, 2010.

33.    In June of 2010, the Debtors began discussions with the UAW and its negotiating committee (the "**Negotiating Committee**") regarding the Debtors' financial condition and ability to continue to fund their Pension Plan obligations. On multiple occasions, the Debtors presented information to the Negotiating Committee, and to the Debtors' employees and Pension Plan participants directly, regarding the Debtors' cash position, the underfunded status of the Pension Plan and the Debtors' inability to fund the Pension Plan. These ongoing discussions and presentations explored various modification and termination options including, but not limited to, requiring employee contributions for medical coverage, converting current employees to the 401(k) plan instead of the Pension Plan, a freeze of any COLA under the Pension Plan, pay cuts and voluntary termination of the Pension Plan. On December 11, 2010, the UAW voted not to amend the CBA to allow for any modification of the Pension Plan. On December 17, 2010, the Debtors further advised the Negotiating Committee of the need to terminate the Pension Plan and on December 27, 2010, the Debtors' Board of Directors mailed a letter to all Pension Plan participants informing them of the likely termination of the Pension Plan and its resulting turnover to the Pension Benefit Guaranty Corporation (the "**PBGC**").

33.     On January 13, 2011, the Debtors' outside counsel for Pension Plan issues made a presentation to all of the Debtors' employees regarding the voluntary or involuntary termination of the Pension Plan, including the possibility of a distressed termination through a bankruptcy filing, details regarding its transition to the PBGC and the resulting effect on benefits received under the Pension Plan.  On January 17 and January 20, 2011, the Debtors' employees were provided with flyers containing follow up information from the January 13th presentation and answers to frequently asked questions regarding pension plan terminations and benefits received from the PBGC.

34.     On January 19, 2011, the Debtors' Board of Directors requested a vote by the UAW membership to amend the CBA to eliminate the Pension Plan.  On January 26, 2011, the Debtors' management met with the Negotiating Committee and the Debtors' general counsel, Doris K. Sewell, sent a letter to Jimmy Porter, President of the UAW Local 1155, outlining the likely results of the UAW's refusal to amend the CBA, including the closing of the Debtors' facility and the cessation of operations (the "**January 26 Letter**").  The same day, copies of the January 26 Letter were distributed to all employees at the end of their shift.

35.     The January 26 Letter pointed out the need for bargaining with respect to the Pension Plan issues that had been the subject of requests for bargaining since June 2010.  The January 26 Letter made it very clear that the Debtors were "considering options that could result in the closing of our facility in the very near future and *we are formally requesting that Local 1155 bargain with us immediately over that decision and its effects* and to work with us in good faith to reach a solution that will provide AAII with sufficient relief under the CBA to minimize the possibility of closing."  In the January 26 Letter, the Debtors requested a response by the

close of business on Friday, January 28, 2011, and suggested that negotiations begin on Monday, January 31, 2011.

36.     That request was summarily rejected by the Union.     Specifically, on January 28, 2011, the UAW sent a letter to the Debtors' management notifying the Debtors that the UAW would neither modify nor amend the CBA.

37.     On February 11, 2011, the Debtors' management sent a letter to the President of the UAW Local 1155 notifying the UAW of the likely cessation of the Debtors' operations by April 15, 2011, absent the elimination of the Debtors' obligations under the Pension Plan, and providing the requisite notice to the UAW and its members in satisfaction of the Worker Adjustment and Retraining Notification Act (the **"WARN Notice"**).  In response to the WARN Notice, by letter dated February 11, 2011, the UAW replied that if the Debtors were "seriously considering" the closure of the Debtors' operations, the International Union UAW would request the opportunity to bargain for the UAW Local 1155 at the earliest date possible.  The Debtors participated in discussions with the UAW on February 14, 2011, seeking to persuade the union to begin bargaining over the pension plan immediately.  The Debtors' management sent a follow-up e-mail to Ray Curry, assistant director of UAW Region 8, offering to schedule immediate discussions, but the union responded on February 15, 2011 that it would not agree to bargain.

38.     The necessary modifications of the CBA and termination of the Pension Plan, and the UAW's unwillingness to bargain over or agree to those changes, is the primary driving force behind the Debtors' Chapter 11 filings.  In the near term, the Debtors intend to seek to modify the CBA to allow for the termination of the Pension Plan, and other necessary modifications, pursuant to applicable federal bankruptcy law.  The estimated penalty for termination of the Pension Plan is over $10.5 million.

## III.  DEBTORS' EQUITY AND DEBT STRUCTURE

### A.  The Debtors' Equity Structure

39.     The Debtors' common stock is traded over-the-counter through Pink OTC Markets, Inc. on the "Pink Sheets." The Debtors have fewer than 100 registered, street level holders of AAII stock with over 4.5 million shares outstanding.

40.     The Debtors' stock was previously listed with the Securities and Exchange Commission (the "**SEC**") and traded through the NASDAQ Stock Market LLC (the "**NASDAQ**"). On March 31, 2009, the Debtors filed a Form 25 with the SEC, voluntarily delisting their stock from the NASDAQ. As a result of the Form 25 filing, and the Debtors' filing of a Form 15 on April 10, 2009, the Debtors' stock was deregistered under Section 12 of the Securities Exchange Act of 1934 (the "**Exchange Act**"), effective July 9, 2009. In connection with the deregistration and delisting of the Debtors' stock, the Debtors' reporting obligations under Section 15(d) of the Exchange Act were suspended. The Debtors' final Form 10-K, for the year ending December 31, 2008, was filed with the SEC on March 31, 2009.

### B.  The Special Value Bond Fund

41.     The Debtors are party to a note purchase agreement (the "**Note Purchase Agreement**") with the Special Value Bond Fund, LLC ("**SVBF**"), which is managed by Tennenbaum Capital Partners, LLC, with a principal amount of $2.5 million (the "**SVBF Note**"). The SVBF Note accrues interest at an annual rate of 15%, payable quarterly in arrears, and the default rate is 17%. In connection with the SVBF Note, SVBF maintains a security interest in substantially all of the Debtors' assets.

42.     The Note Purchase Agreement was originally entered into by the Debtors and Silver Canyon Services, Inc. on or about February 15, 2006, but was subsequently transferred to

SVBF and has been extended on an annual basis through February 15, 2011. The Debtors and SVBF have been unable to reach an agreement for a further extension and the Debtors have been unable to refinance the debt due to their Pension Plan obligations.

**C.    The PBGC Liens**

43.    On February 29, 2008, the Debtors applied to the Internal Revenue Service (the "**IRS**") for a waiver of contributions for the 2007 plan year, for which final payments were due on September 15, 2008. Having received no response from the IRS, the Debtors contributed $3.9 million to the Pension Plan on September 15, 2008, fully satisfying the contribution requirements for 2007. Subsequently, the IRS granted the 2007 waiver, deferring the 2007 contribution requirements and spreading the same over five (5) years. As a result, the $3.9 million contribution made on account of 2007 contributions due was recharacterized as a contribution for the 2008 plan year. The Debtors timely funded the additional $500,000 contribution due for the 2008 plan year in the first quarter of 2009. The Debtors have contributed over $60 million to the Pension Plan over the past ten (10) years.

44.    Prior to the IRS's grant of the 2007 waiver request, on September 4, 2008, the PBGC filed liens on the Debtors' assets on account of the unpaid 2007 contributions, calculating the amounts due and owing at $3,335,455 (the "**2007 Lien**"). The Debtors dispute the validity of this lien as it was satisfied, in full, by the Debtors' payment in full of the 2007 contributions owed on September 15, 2008. Though the 2007 contributions actually made were recharacterized as 2008 contributions, the PBGC has not filed a replacement lien on account of the Debtors' now deferred 2007 contributions.

45.    Additionally, on January 21, 2011, the PBGC filed an additional lien against the Debtors' assets in the amount of $2.995 million, which appears to be related to the three required

14

quarterly minimum funding payments attributable to 2010 that were due on or before January 15, 2011, and were not paid to the Pension Plan (the "**2010 Lien**"). In that filing, the PBGC also asserted the accrual on the 2007 Lien to now total $4,014,929. It is possible that the 2010 Lien is avoidable.

**D.      The Wells Fargo Letter of Credit**

46.      Though the Debtors currently maintain full workers' compensation coverage through Liberty Mutual Group, Inc., from April 1, 2004, through April 1, 2005, the Debtors were self-insured pursuant to that certain Loss Fund and Security Agreement with Great American Insurance Company of New York ("**Great American Insurance**") with respect to workers' compensation claims asserted against it (Policy No. WC617, the "**Great American Policy**"). Despite the expiration of the Great American Policy, pursuant to the terms thereof, the Debtors are required to maintain collateral in the form of an irrevocable letter of credit for the benefit of Great American Insurance in an amount equal to the lesser of 200% of the open reserves or the aggregate of all deductibles under the Great American Policy.

47.      In compliance with the Great American Policy, the Debtors posted collateral for letter of credit numbered 04.OD.06371 (the "**Letter of Credit**") issued to Great American Insurance by SouthTrust Bank, n/k/a Wachovia Bank, N.A. n/k/a Wells Fargo Bank, N.A. ("**Wells Fargo**"). In connection with Great American Insurance's most recent review of the Great American Policy, the Debtors' collateral obligations under the Policy total $100,000 and the Letter of Credit was reduced to such amount on November 3, 2009. The Debtors maintain $100,000 in a segregated, restricted account at Wells Fargo, fully collateralizing the Debtors' obligations to Great American Insurance and to Wells Fargo under the Letter of Credit.

### E.    Other Secured Debt

48.    The Debtors are party to a capital lease with Modular Space Corporation ("**Modular Space**") dated February 9, 2009, relating to modular office space utilized on the grounds of the Debtors' facility (the "**Modular Space Lease**"). Pursuant to the terms of the Modular Space Lease (and related Uniform Commercial Code lien filings), the Debtors' obligations under the Modular Space Lease are secured by the physical assets that are the subject of the Lease. As of December 31, 2010, the Debtors' total outstanding obligations under the Modular Space Lease were approximately $48,000.

49.    The Debtors are party to a promissory note with Pinnacle Leasing, Inc. ("**Pinnacle**") dated July 6, 2009, in the amount of $84,243 (the "**Pinnacle Note**"). The Pinnacle Note is secured by a security agreement dated July 6, 2009 (the "**Pinnacle Security Agreement**"), granting Pinnacle a security interest in certain precision equipment sold to the Debtors by Pinnacle. As of December 31, 2010, the Debtors' total obligations outstanding under the Pinnacle Note were approximately $64,000.

## IV.    THE DEBTORS' LIQUIDITY CRISIS

50.    The Debtors' primary sources of liquidity and capital resources include cash-on-hand and cash flows from operations, primarily from collection of accounts receivable and conversion of work-in-process inventory to cash. The Debtors receive milestone payments on the majority of their government contract and subcontracts. The principal factors affecting the Debtors' liquidity and capital resources include, but are not limited to, the results of operations, the number of milestone payment achieved, the collection of accounts receivable, funding requirements and possible termination fees associated with the Pension Plan, settlements of various claims and payments due on the Debtors' long and short term debt.

51.     Due to the UAW's unwillingness to amend the CBA to allow modifications to the Pension Plan, the loss of the KC-135 contract and the Debtors' inability to procure commitments on additional contracts, the Debtors have been unable to obtain additional financing or a refinancing of the debt owing to the SVBF, which has now matured. Additionally, as has been the case for many years, the Debtors' revenues are insufficient to support their ongoing Pension Plan obligations, which exceeded 57% of revenues in 2010.

52.     The Debtors' current, substantial accounts receivable include over $2.2 million in payments due and owing to the Debtors by Boeing under the KC-135 program during February and March 2011. If Boeing fails to timely make these payments, the Debtors will have insufficient liquidity to continue their operations.

53.     Additionally, the Debtors hold a judgment for approximately $10.5 million against GE Capital Aviation Services, Inc. (the "**GECAS Judgment**"), which is currently before the Supreme Court of Alabama and awaiting decision. The Debtors anticipate receiving 60-67% of any favorable verdict rendered, net of contingent legal fees. While the Debtors anticipate realizing significant liquidity from collection on the GECAS Judgment, the outcome before the Supreme Court of Alabama and the collectability of the Judgment is uncertain and the Debtors, therefore, cannot rely on receivables relating to the GECAS Judgment to fund their ongoing operations.

54.     As set forth in greater detail above, the Pension Plan was underfunded by more than $31.4 million as of December 31, 2010, the Debtors' revenues will not support the Debtors' required contributions to the Pension Plan of more than $5.7 million annually, which will only increase as more of the Debtors' workforce retire, and the debt owing to the SVBF has matured with the Debtors having no viable options for refinancing.

## V.  THE DEBTORS ELECT TO SEEK RELIEF UNDER CHAPTER 11

55.     As result of the Debtors' liquidity position, including the maturity of the SVBF Note and the Debtors' inability to fund their ever-increasing Pension Plan funding obligations, and the UAW's unwillingness to modify the CBA to allow for any modifications to the Pension Plan, the Debtors began to consider various alternatives to maximize the value of their businesses for the benefit of all of their stakeholders.  Working with their counsel and advisors, the Debtors determined that commencing cases under Chapter 11 of the Bankruptcy Code provided the best avenue to preserve value and maximize the value of their estates.

## VI.  THE DEBTORS' INTENT TO MAXIMIZE GOING CONCERN VALUE

56.     The Debtors intend to focus their reorganization efforts on restructuring their debt, working with the UAW to modify or terminate the Pension Plan and working with the PBGC to address any termination liability resulting therefrom, reviewing their existing executory contracts to determine whether those contracts are in line with the Debtors' cost structure, and strengthening the Debtors' core operations.  The Debtors also intend to explore the potential sale of one or more of their divisions, owned technology, or other business units to maximize the value of their businesses.

57.     The bankruptcy filing also preserves the Debtors' ability to analyze their short-term and long-term obligations, and to determine what steps should be taken to preserve value for their estates.

## VII.  SUPPORT OF FIRST DAY MOTIONS

58.     As a result of my first-hand experience, my review of various materials and information, discussions with the Debtors' executives, and discussions with the Debtors' advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the

Debtors in the motions addressed below (the "**First Day Motions**"), (b) the need for the Debtors to continue to operate effectively, and (c) the deleterious effects upon the Debtors of not obtaining such relief.

59.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct.  Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  In connection with the First Day Motions, I declare as follows:

### A.     Motion for Joint Administration

60.     Through the Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases (the "**Motion for Joint Administration**") the Debtors request that the Bankruptcy Cases be administered jointly, utilizing one docket and one case number, so as to reduce the administrative burden on the Court, the Debtors and parties in interest.  The Debtors' operations are conducted through three entities, all of which are Debtors in these Bankruptcy Cases.  The organization chart attached hereto as "Exhibit A" shows all of the Debtors.  AAII-Birmingham and Pemco are wholly owned subsidiaries of AAII.  Despite common ownership and interrelated business operations, each Debtor maintains separate books and records, including audited financial statements.

61.     Although the Debtors have separate and distinct assets, together the Debtors provide aircraft maintenance and modification services to the Debtors' U.S. government and military customers.  In providing such services, the Debtors put forth a single integrated business model to their customers.  Accordingly, in some instances, multiple Debtors were parties to the

same transaction or multiple related transactions. Therefore, many of the notices, applications, motions, and other pleadings filed, and much of the relief sought, in these cases will concern more than one, or all, of the Debtors. Moreover, the Debtors anticipate that these Bankruptcy Cases will proceed on the same timetable. Absent joint administration, the resources of the Debtors, the Court and other parties would be wasted by the filing and service of the same or similar pleadings in multiple cases.

62.     The joint administration of these Bankruptcy Cases will ease the administrative burden on the Court by allowing the Clerk of the Court, parties in interest, and the Debtors to use a single general docket for these cases rather than maintaining and updating three different dockets. Similarly, joint administration will eliminate the need for duplicative notices, applications and orders, allowing the Debtors, their creditors and other parties in interest to file one pleading in a consolidated case rather than several pleadings in the Debtors' several individual cases, to combine and streamline service of those pleadings and other notices on creditors and other parties in interest, and to monitor these Bankruptcy Cases by reviewing one docket rather than three (3) separate dockets. In sum, joint administration of the Bankruptcy Cases will reduce the number of documents that must be prepared, filed and served in connection with these Bankruptcy Cases, reduce the administrative burden of coordinating these cases, and reduce the monitoring burden that these cases will impose on the Court, the Clerk of the Court, the Office of the United States Trustee and all other parties in interest.

63.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these Bankruptcy Cases because the rights of each creditor against the respective estates will be preserved. The Debtors' Motion for Joint Administration is not a motion for substantive consolidation of the Debtors' estates and does not

seek to change the relative rights and remedies of creditors against any of the individual Debtors. Accordingly, the substantive rights of parties in interest should not be prejudiced or otherwise negatively affected by the entry of an order directing the procedural joint administration of these Bankruptcy Cases.

**B.  Motion Regarding Cash Management**

64.     Through the Motion Pursuant to Sections 105(a), 345(b), and 363(c) of the Bankruptcy Code for an Order (i) Authorizing the Debtors to Continue Use of Cash Management System, (ii) Authorizing Waiver of Certain Bank Account and Related Requirements of the Office of the United States Trustee for the District of Delaware, and (iii) Waiving the Requirements of 11 U.S.C. § 345(b) (the "**Motion Regarding Cash Management**") on an Interim Basis the Debtors seek the authority to continue utilizing their existing bank accounts in the ordinary course of their business.     AAII maintains a concentration account (the "**Concentration Account**"), a disbursement account (the "**Disbursement Account**") a payroll account (the "**Payroll Account**"), and an account that holds payroll taxes not yet due (the "**Payroll Tax Account**") at Wells Fargo Bank, N.A. ("**Wells Fargo**") and a direct deposit account (the "**Direct Deposit Account**") at BBVA Compass ("**BBVA**") that are all utilized in the ordinary course of the Debtors' business in connection with the Debtors' payroll and operations.

65.     Additionally, the Debtors have an additional segregated, restricted account with Wells Fargo that maintains a $100,000.00 balance and serves as collateral for the Debtors' funding of their 2004-2005 workers' compensation policy as required by their former workers' compensation provider (the "**Workers' Compensation Account**").     The Debtors' former workers' compensation provider, Great American Insurance, is the beneficiary of the Letter of

Credit issued by Wells Fargo's predecessor, SouthTrust Bank, in the amount of $100,000, which is fully collateralized by the Workers' Compensation Account.

66.     Pursuant to a deferred compensation agreement with the Debtors' current chief executive officer, Ronald Aramini (the "**CEO**"), the Debtors maintain the CEO's deferred compensation in a rabbi trust (the "**Rabbi Trust**," together with the Concentration Account, the Disbursement Account, the Payroll Account, the Payroll Tax Account, the Direct Deposit Account and the Workers' Compensation Account, the "**Accounts**") at Regions Bank. The funds in the Rabbit Trust are invested in United States Treasury bills.

67.     The Debtors are seeking authority from this Court to honor all payroll related obligations, which are paid only out of the Payroll Account. The Debtors are also seeking authority for their banks and financial institutions to honor certain payments made in respect of the Debtors' other Employee Obligations, Payroll Tax Obligations and Insurance Obligations, as set forth more fully in the Motion to Honor Employee Obligations. Fewer than ten (10) issued, but not cleared checks are the subject of this request and fewer than thirty (30) non-payroll related checks in total remain outstanding on the Disbursement Account. As a result, the Debtors will be able to easily identify all prepetition checks and other forms of payment outstanding on the Petition Date and will notify Wells Fargo not to pay such checks or obligations, except to the extent such payment has been authorized by order of this Court.

68.     The continued use and maintenance of the Debtors' existing Accounts, at least on a temporary basis, as well as the continued use of the checks relating to those Accounts, will prevent the Debtors from incurring unnecessary administrative expense and burden, and will allow the Debtors to focus on reorganizing their businesses and operating the same so as to maximize value for the estates and their creditors.

## C.     <u>Motion to Honor Employee Obligations</u>

69.     Through the Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Employee Wages and Salaries, Payroll Related Taxes, Reimbursable Expenses, Health Plan Claims, and Insurance Premiums; (B) Authorizing the Debtors to Maintain Their Employee-Related Insurance Programs Postpetition, and Honor any Prepetition Obligations in Respect Thereof; (C) Authorizing the Debtors to Make Deductions from Employees' Paychecks; (D) Authorizing the Debtors to Continue Workers' Compensation Programs; and (E) Authorizing and Directing Banks and Other Financial Institutions to Honor All Checks and Electronic Payment Requests Made by the Debtors Related to the Foregoing (the "**Motion to Honor Employee Obligations**"), the Debtors are seeking the Court's permission to take certain actions as to certain unpaid prepetition employee obligations, payroll tax obligations and insurance obligations and to continue certain employment procedures and programs that will ensure the Debtors' workforce will remain available to preserve the Debtors' value as a going concern.

70.     The relief sought is vital to the employees as well.  Nonpayment of employee compensation and benefits and the inability to create some level of normality in the postpetition workplace by assuring employees that the Debtors can continue certain prepetition employment practices and programs, such as employee health benefits and vacation and sick time practices, could severely undermine morale, thus creating a significant risk of attrition at a time when the employees' support is critical.  In fact, if the Motion to Honor Employee Obligations is not granted, the disruption to usual operations that would be caused by the loss of employees would have other significant costs, including the out-of-pocket and intangible costs to recruit and train new employees and the loss of fees earned by the Debtors under their various contracts

for the timely completion of aircraft maintenance and repairs. Such loss of employees and the resulting delays in the Debtors' productivity would further strain the Debtors' relationships with their customers and vendors.

71.     Without their existing workforce, the Debtors would likely be unable to meet their obligations to the detriment of the Debtors' ability to reorganize. Accordingly, I believe that the payment of the amounts, and the continuation of the employee programs, described in the Motion to Honor Employee Obligations is in the best interests of the Debtors' estates and creditors, and is critical to the success of these Bankruptcy Cases.

### Prepetition Business Expense Reimbursements

72.     Before the commencement of their Bankruptcy Cases, the Debtors reimbursed certain employees for various expenses incurred in connection with services rendered for the benefit of the Debtors, including, without limitation, cellular phone use, business travel, and entertainment expenses. The expenses incurred by the Debtors employees and reimbursed by the Debtors were expenses incurred directly related to the Debtors' businesses. These expenses are ordinarily reimbursed during the month after the expense is incurred. As of the Petition Date, certain employees have not yet submitted expense reimbursement requests or such requests may have been submitted but not yet processed. As of the Petition Date, the amount of expenses accrued but not yet reimbursed for business travel should not exceed $5,000. These expenses should be reimbursed in the ordinary course of business because they relate directly to the Debtors' business and are not personal charges. Accordingly, the Debtors seek authority to reimburse employees for these expenses.

73.     Additionally, six (6) of the Debtors' employees are currently residing and working in the country of Jordan and four (4) of the Debtors' employees are residing and

working in California. In addition to otherwise reimbursable business expenses, included in the preceding paragraph, those employees working in Jordan receive a per diem allowance of $102 and those employees working in California receive a per diem allowance of $55 (the "**Per Diem Amounts**"). The Per Diem Amounts, totaling $5,824 in the aggregate, are deposited into the employees' personal bank accounts in advance at the beginning of each work week and, accordingly, no amounts are owing to these employees in connection with the Per Diem Amounts as of the Petition Date. The Debtors also provide hotel and travel accommodations for their employees working in Jordan and California, providing payment for such accommodations directly to the hotel or airline or by reimbursement if an employee incurs the expense. The Debtors seek authority to continue to pay the Per Diem Amounts and to continue to provide hotel and travel accommodations to their off-site employees in the ordinary course of their business following the Petition Date.

### Payroll

74.     The Debtors' highly skilled workforce is currently comprised of ninety-two (92) salaried employees and two hundred thirty-four (234) hourly employees. The majority of the Debtors' hourly employees have been employed by the Debtors for over thirty (30) years and are each trained and possess a skill set related to a specific, vital segment of the Debtors' operations, from electrical rewiring and metal works to depainting and upholstery.

75.     The Debtors process and manage their payroll in-house. As set forth in more detail in the Motion Regarding Cash Management, all payroll related obligations are funded from the Payroll Account, a zero balance account to which the Debtors transfer the necessary funds from the Concentration Account prior to issuing payroll checks. With respect to those employees who have requested the direct deposit of their payroll compensation, the Debtors

transfer the necessary funds from the Payroll Account into the Direct Deposit Account at BBVA, which funds are then transferred to the Debtors' employees. The Direct Deposit Account maintains a balance of less than $2,000.00 and acts as a pass through account from the Debtors' Payroll Account at Wells Fargo to the Debtors' employees.

76.    Ninety-two (92) of the Debtors' employees are compensated on a salaried basis and are compensated on the 15th and the last day of each month for all time worked through the date of such payment. Payroll for salaried employees aggregates approximately $256,000 per pay period.

77.    Two hundred thirty-four (234) of the Debtors' employees are compensated on an hourly basis and are paid weekly each Friday for services performed the preceding Monday through Sunday. Payroll for hourly employees aggregates approximately $200,000 per week.

78.    Because salaried employees are paid on the 15th day of each month for services performed through that date, all salaried employees have been compensated through the Petition Date and thus no wages are due to salaried employees for prepetition services. The next scheduled payroll for hourly employees is February 18, 2011, and thus as of the Petition Date, the Debtors had not paid their hourly employees accrued and unpaid wages for services performed on or after Monday, February 7, 2011. Additionally, some checks that have been issued to both salaried and hourly employees may not have been presented for payment or may not have cleared through the Debtors' bank accounts and the Debtors therefore request that their banks and other financial institutions be authorized and directed, when requested by the Debtors, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts for any such payroll checks issued prepetition. The Debtors believe that the aggregate amount of such

accrued but unpaid wages, or that have been paid but not yet presented for payment or cleared through the banking system, should not exceed $39,000.

79.     Included in the payroll amounts described above are funds withheld by the Debtors for the benefit of third parties, including amounts relating to employee taxes, deductions for union dues, insurance premium contributions for salaried employees and certain hourly employees hired after March 21, 2005, supplemental insurance policy premiums, 401(k) contributions, flexible spending account contributions, child support and other garnishments, contributions in connection with a voluntary credit union savings program and other withholdings as required by federal, state, and local laws. The Debtors transfer such withheld funds to the appropriate recipient on the same day the funds are withheld, or as soon thereafter as is practicable. As such, the Debtors believe that as of the Petition Date some funds withheld from employee wages and salaries may not have been transferred to the appropriate agency or recipient. Accordingly, the Debtors also seek authority to release those withheld funds to the appropriate recipient.

## Accrued Vacation Time

80.     In accordance with the Debtors' General Administrative Procedures, employees accrue vacation time from April 1 through March 31, to be taken between May 1 and April 30 of the following year. Hourly employees earn vacation based on their average number of hours worked during the vacation year accrual period at the following levels based on seniority:

| LENGTH OF SERVICE | AMOUNT OF VACATION |
|---|---|
| Less than six (6) months | None |
| Six (6) to twelve (12) months | One (1) week, with not less than twenty (20) nor more than twenty-four (24) hours, with pay |
| More than one (1) year but less than two (2) years | One (1) week, with not less than forty (40) nor more than forty-eight (48) hours, with pay |
| More than two (2) years but less than twelve (12) years | Two (2) weeks, with not less than eighty (80) nor more than ninety-six (96) hours, with pay |
| More than twelve (12) years but less than twenty (20) years | Three (3) weeks, with not less than one hundred twenty (120) nor more than one hundred forty-four (144) hours, with pay |
| More than twenty (20) years | Four (4) weeks, with not less than one hundred sixty (160) nor more than one hundred ninety-two (192) hours, with pay |

81.    Salaried employees are entitled to vacation days based on seniority at the following levels:

| Less than twelve (12) years | Ten (10) days, with pay |
|---|---|
| More than twelve (12) years but less than twenty (20) years | Fifteen (15) days, with pay |
| More than twenty (20) years | Twenty (20) days, with pay |

82.    All employees receive ten (10) paid holidays per year, New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the Friday following Thanksgiving Day, Christmas Eve, Christmas Day and New Year's Eve.

83.    As required by certain state laws, the Debtors customarily pay severed employees for accrued but unused vacation days in the employees' final pay checks, provided, however that any severed salaried employee must have been employed by the Debtors for at least six (6) months and have provided two (2) weeks notice of their resignation in order to receive pay for unused vacation.   Additionally, certain of the Debtors' two hundred and fifty-one (251) inactive, furloughed employees may have opted not to receive the immediate payout of their accrued but unused vacation upon being furloughed, instead choosing to maintain their accrued vacation balance in the event of their re-employment by the Debtors.  Prior to the Petition Date,

the Debtors compensated the furloughed employees for their accrued but unused vacation upon request.

84.     As of the Petition Date, the approximate amount of accrued but unpaid vacation for active employees totals approximately $1,137,000 and the amount of accrued but unpaid vacation for furloughed employees totals approximately $158,000.

85.     The Debtors anticipate that their employees will be critically concerned about their ability to take vacation time following the commencement of these Bankruptcy Cases. The Debtors are in turn concerned that if it cannot advise employees on this issue during the crucial first days following the filing, the employees may have knee-jerk reactions and heightened concerns about their ability to obtain fair treatment going forward, which may lead to rapid attrition.

86.     The Debtors therefore request that the Court authorize, but not require, the Debtors to (a) allow employees to use vacation time accrued before the Petition Date in accordance with the Debtors' existing vacation policy and (b) pay in the ordinary course the liquidated amounts for any vacation hours <u>accrued after the Petition Date</u> to any employees who separate from the Debtors' employ after the Petition Date.

<strong><u>Personal Time/Leave.</u></strong>

87.     In accordance with the CBA, hourly employees that are on the Debtors' active payroll accrue hours to be used for personal time off or sick leave ("**Casual Leave**"). For employees with at least twelve (12) months of continuous service, Casual Leave accrues from June 30th to June 29th of the following year at a rate of forty (40) hours per year. Casual Leave is cumulative up to eighty (80) hours and employees are paid for any unused Casual Leave accrued in excess of eighty (80) hours. Additionally, employees have the option of

29

requesting payment for accrued but unused Casual Leave no later than ten (10) days prior to the end of the Casual Leave accrual year. Similar to payment for unused vacation, the Debtors have customarily compensated hourly employees for unused Casual Leave upon termination, with furloughed employees having the option of maintaining accrued Casual Leave or receiving payment for such Casual Leave on request. As of the Petition Date, the approximate amount of accrued but unpaid Casual Leave totals approximately $122,000 for active employees and $32,000 for furloughed employees.

88.     Salaried employees who have been employed by the Debtors for at least three (3) months are entitled to five (5) days of sick leave annually, which accrue annually as of the employees' anniversary date ("**Sick Leave**"). While Sick Leave is cumulative, it is not payable upon separation of employment.

89.     As with vacation time, the Debtors anticipate that their employees will express substantial and immediate concern about their ability to continue to use Casual Leave and Sick Leave accrued prior to the Petition Date. The inability to advise the employees early on with respect to this issue would undoubtedly lead to unnecessary stress among the employees and thus create substantial detriment to the morale of the workforce. Accordingly, the Debtors seek authority, but not direction, to (a) allow employees to use Casual Leave and Sick Leave earned prior to the Petition Date, in accordance with the Debtors' existing Casual Leave and Sick Leave policies, and to pay the employees for the corresponding time off and (b) pay in the ordinary course the liquidated amounts for any Casual Leave accrued after the Petition Date to any hourly employees who separate from the Debtors' employ after the Petition Date.

## Compensatory Time

90.     In lieu of compensated overtime, employees may accrue compensatory time when hours worked in excess of forty (40) hours in a given work week are preapproved to be worked by a senior level officer of the Debtors ("**Comp. Time**"). Comp. Time is cumulative up to twenty-four (24) hours and, once accrued, may be used for time off with pay. Comp. Time is not paid upon separation of employment.

91.     As with vacation time, Casual Leave and Sick Leave, the Debtors anticipate that their employees will express substantial and immediate concern about their ability to continue to use Comp. Time accrued prior to the Petition Date. The inability to advise the employees early on with respect to this issue would undoubtedly lead to unnecessary stress among the employees and thus create substantial detriment to the morale of the workforce. Accordingly, the Debtors seek authority, but not direction, to (a) allow employees to use Comp. Time earned prior to the Petition Date, in accordance with the Debtors' existing Comp. Time policy, and (b) pay the employees for the corresponding time off.

## Medical, Dental, Disability, Accident and Life Insurance Benefits

92.     The Debtors provide medical, dental, accident, and sickness benefits to their employees and certain early retirees (the "**Medical Benefits**"). Medical Benefits for salaried employees are funded, in part, through deductions from the employees' compensation at the current level of $45 per month for the employee, $90 per month for the employee plus one dependent or $120 per month for the employee and their family. Pursuant to the terms of the CBA, UAW members with a hire date prior to March 21, 2005, receive full coverage medical benefits for themselves and their families at no cost to the employee and UAW members with a

start date on or after February 7, 2010, are eligible to participate in the salaried employee medical plan with the employee contribution levels frozen at the 2010 level until 2013.

93.    The monthly premiums for the Debtors' salaried employees' Medical Benefits total $83,454, offset by $6,585 in employee contributions and the monthly premiums for the Debtors' hourly employees' Medical Benefits total $158,384.60, offset by $1,829.60 in employee contributions.  The Debtors utilize Blue Cross Blue Shield of Alabama ("**Blue Cross**") for their employee medical and dental coverage, which coverage is fully funded by the Debtors. The Debtors pay $337,600 to Blue Cross each month to cover estimated claims against the policies for that month and Blue Cross reconciles the claims the following month, charging the Debtors a true-up payment or issuing a refund to the Debtors, as appropriate.

94.    Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "**COBRA**"), the Debtors are obligated to offer eligible terminated employees (not all terminated employees are eligible for COBRA participation) the opportunity to continue insurance coverage under the Debtors' then-existing insurance plans.  Any eligible former employee and his or her dependents that elect to participate are entitled by law to insurance coverage from the Debtors for between 18 and 36 months.  Although participating former employees pay the full premium amounts associated with such coverage, because the insurance plans in which these former employees participate are self-funded by the Debtors, the ultimate liability to the Debtors, including some claims that accrued pre-petition but that have not yet been paid, may well exceed the premiums paid by the participants.  Through the COBRA coverage, there are currently an estimated 70 former employees receiving Medical Benefits through the Debtors.

95.    The Debtors also offer various supplemental medical coverage through the Professional Insurance Company and Prudential Insurance Company of America (the "**Supplemental Medical Coverage**"), the full premiums for which are funded through employee payroll deductions and total less than $800 per month.

96.    The Debtors also provide short-term disability insurance, long-term disability insurance, basic life insurance, supplemental life insurance and accidental death and dismemberment insurance to their employees (the "**Life and Disability Insurance Programs**") through the Prudential Insurance Company of America.  The premiums for the short-term disability insurance, basic life insurance and accidental death and dismemberment insurance are paid in full by the Debtors at a cost of approximately $12,130 per month and such coverage provides a $250 per week indemnity for short term disability and life insurance and accidental death and dismemberment benefits equal to annual compensation for salaried employees and $25,000 for hourly employees.  The premiums for the long-term disability insurance are approximately $1,318 per month, offset by $660 in employee contributions and the premiums for the supplemental life insurance are approximately $4,908 per month, but are funded in full by employee payroll deductions.  The Debtors anticipate that there will be no unpaid premiums associated with the Life and Disability Insurance Programs as of the Petition Date.

97.    The Debtors anticipate that as of the Petition Date there will be no unpaid Medical Benefits, Supplemental Medical Coverage benefits or Life and Disability Insurance Program benefits that accrued prior to the Petition Date but that have not been paid, with the exception of any reconciliation payment due to Blue Cross in March 2011 for benefits provided prior to the Petition Date that exceed the estimated monthly premium.  Additionally, the Debtors issued three (3) checks totaling approximately $19,000 to the Professional Insurance Company and the

Prudential Insurance Company of America prior to the Petition Date on account of the Supplement Medical Coverage and Life and Disability Insurance Programs that the Debtors anticipate may not clear the Debtors' bank accounts prior to the Petition Date. The Debtors therefore request that their banks and other financial institutions be authorized and directed, when requested by the Debtors, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts on account of the Medical Benefits, Supplement Medical Coverage and Life and Disability Insurance Programs.

98. As with vacation and personal leave time, the Debtors anticipate that their employees will express substantial and immediate concern about their Medical Benefits, Supplemental Medical Coverage and the Life and Disability Insurance Programs. The inability to advise the employees early on with respect to their Medical Benefits, Supplemental Medical Coverage and the Life and Disability Insurance Programs would undoubtedly lead to unnecessary stress among the employees and thus create substantial detriment to the morale of the workforce. Accordingly, the Debtors seek authority, but not direction, to honor and continue the Medical Benefits, Supplemental Medical Coverage and the Life and Disability Insurance Programs, subject to any modifications or amendments to the CBA with respect to the Medical Benefits, Supplemental Medical Coverage and the Life and Disability Insurance Programs as may be agreed to by the Debtors and the UAW.

**401(k) Plan**

99. The Debtors sponsor a tax-qualified retirement savings plan pursuant to Section 401(k) of the Internal Revenue Code (the "**401(k) Plan**"). The 401(k) Plan is managed by Ascensus. The Debtors' salaried employees and certain hourly employees are eligible to participate in the 401(k) Plan. With respect to the Debtors' nineteen (19) guards and firefighters,

the Debtors match $0.50 for each dollar invested of the first 6% of the employee's compensation contributed to the 401(k) Plan. The remainder of the Debtors' employees, including UAW members participating in the 401(k) Plan, do not currently receive matching contributions from the Debtors. Ordinarily, 401(k) contributions total approximately $966.68 per week for hourly employees, including $785.97 of employee contributions and $180.71 from matching contributions, and $7,093 semi-monthly for salaried employees, funded entirely by employee contributions. The Debtors anticipate that as of the Petition Date they will have no outstanding employee contributions that have not been transferred to the 401(k) Plan. The Debtors seek authority, but not direction, to honor and continue the 401(k) Plan, subject to any modifications or amendments to the CBA with respect to the 401(k) Plan as may be agreed to by the Debtors and the UAW.

## Flexible Spending Accounts and Savings Accounts

100. The Debtors' employees are eligible to establish flexible spending accounts ("**FSAs**") into which they may contribute funds on a pre-tax basis for future reimbursement of certain allowable medical expenses. The FSAs are fully funded through employee payroll deductions and total approximately $730 per month. The Debtors anticipate that as of the Petition Date they will have no outstanding employee contributions that have not been transferred to the FSAs. The Debtors seek authority, but not direction, to honor and continue the FSAs.

101. The Debtors' employees are eligible to participate in a savings program through America's First Credit Union whereby funds are deducted from an employee's paycheck and deposited into a savings account belonging to the individual employee at America's First Credit Union (the "**AFCU Savings Plan**"). The Debtors deduct approximately $7,500 per week from their hourly employees' paychecks and $1,630 per month from their salaried employees'

paychecks on account of the AFCU Savings Plan. Prior to the Petition Date, the Debtors issued checks to AFCU totaling approximately $15,450 on account of their employees' AFCU Savings Plan payroll deductions that the Debtors anticipate may not clear the Debtors' bank accounts prior to the Petition Date. The Debtors therefore request that their banks and other financial institutions be authorized and directed, when requested by the Debtors, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts on account of the AFCU Savings Plan. Additionally, the Debtors seek authority, but not direction, to honor and continue the AFCU Savings Plan.

### Garnishment

102. The Debtors garnish specific amounts from certain employees' wages earned during each payroll cycle and transfer them in accordance with certain court orders. Ordinarily, the Debtors transfer such garnished wages within one week of the payroll pay date. The Debtors garnish approximately $3,800 per month from certain employees' paychecks. The Debtors anticipate that, as of the Petition Date, some transfers made in accordance with garnishment orders may not yet have been presented for payment or may not have cleared through the banking system. The Debtors estimate that the total amount of such transfers will not exceed $3,800. Accordingly, the Debtors seek authority, but not direction, to honor and continue the required garnishments and transfers.

### Workers' Compensation Programs

103. Various state laws require the Debtors to maintain workers' compensation policies and programs to provide their employees with workers' compensation benefits for claims arising from or related to their employment with the Debtors. The Debtors maintain their current workers' compensation coverage through a fully insured, third-party insurance program

(the "**Workers' Compensation Insurance**") provided by the Liberty Mutual Fire Insurance Company ("**Liberty Mutual**") that provides coverage up to applicable statutory awards limits.

104.    The Workers' Compensation Insurance covers all of the Debtors' employees and under the policy, the Debtors pay an annual premium of $425,571 (the "**Estimated Premium**"), subject to a "true-up" (discussed below), regardless of the number of claims filed.

105.    At the conclusion of each policy year, Liberty Mutual performs an audit of the premium based on (i) an average of the initial base employee count provided at the commencement of the policy period and the actual number of employees for each subsequent quarter and (ii) the actual annual payroll for the policy period. If the number of the Debtors' employees exceed those used to calculate the Estimated Premium, the Debtors are required to pay an additional premium to Liberty Mutual in a true-up. The Estimated Premium has been paid in full for the policy period ending April 30, 2011. The Debtors are seeking the Court's authorization to pay any true-up relating to the prepetition policy period, in their discretion, as they come due.

## Payroll Related Taxes

106.    The Payroll Tax Obligations including the withholding from employee paychecks and remittance to the appropriate taxing authority of standard state and federal income taxes. Additionally, the Debtors are required to withhold and remit certain occupational taxes to City of Birmingham, Alabama and Jefferson County, Alabama on behalf of their employees. The Debtors anticipate that as of the Petition Date there will be no Payroll Tax Obligations withheld from employee paychecks that have not yet been remitted to the appropriate taxing authority. The Debtors, however, issued three (3) checks totaling approximately $20,595 to the State of Georgia, the City of Birmingham and Jefferson County prior to the Petition Date on account of

the Payroll Tax Obligations that the Debtors anticipate may not clear the Debtors' bank accounts prior to the Petition Date. The Debtors therefore request that their banks and other financial institutions be authorized and directed, when requested by the Debtors, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts on account of the Payroll Tax Obligations.

**D.    Motion to Pay Taxes**

107.    Through the Debtors' Motion for an Order (i) Authorizing the Debtors to Pay Sales, Use and Similar Taxes in the Ordinary Course of Business; and (ii) Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Relating Thereto (the "**Motion to Pay Taxes**") the Debtors request the authority to honor and pay certain sales and use taxes and other tax obligations in the ordinary course of their business.

108.    Though the services provided by the Debtors to the U.S. Armed Forces are tax exempt, and the Debtors therefore do not collect sales and use taxes from their customers, the Debtors are required to remit sales and use taxes to taxing authorities (the "**Authorities**") for the purchase of certain goods and services from sellers who do not otherwise collect and remit such taxes (the "**Sales and Use Taxes**"). The Debtors are additionally required to pay property and franchise taxes and certain other regulatory fees in the ordinary course of their business (together with Sales and Use Taxes, the "**Taxes**").

109.    The Debtors remitted Sales and Use Taxes to the City of Birmingham, Alabama, Jefferson County, Alabama and other Authorities prior to the Petition Date by issuing and mailing checks totaling less than $1,000 that the Debtors anticipate may not clear the Debtors' bank accounts prior to the Petition Date. I estimate that outstanding prepetition liabilities owing to the various Authorities for Taxes is less than $5,000 inclusive of any Sales and Use Taxes that

may have been paid prior to the Petition Date but had not cleared the Bank Accounts as of the Petition Date.

### E.    Utility Provider Motion

110.  Through the Motion of the Debtors for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (ii) Deeming Utility Companies Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment (the "**Utility Provider Motion**") the Debtors request that the Court prohibit the Debtors' utility providers from disconnecting service to the Debtors and allow the Debtors to deposit funds into an escrow account as adequate assurance of the Debtors' future payment for utility services.

111.  The Debtors' facility is comprised of a complex plant, which depends on the constant and reliable provision of utility services including including natural gas, electricity, sewer, sanitation and other services (the "**Utility Services**") in order to continue operations. Should companies providing utility services ("**Utility Providers**") refuse or discontinue service, even for a brief period of time, the Debtors' business operations would be severely disrupted.

112.  Prior to the petition date, the Debtors paid approximately $234,000 per month to the Utility Providers on account of Utility Services.  Based on the budget analysis performed in preparation for the Bankruptcy Cases, the Debtors' management believes that they have or will have sufficient availability of funds with which to pay all postpetition charges for utility services.

113.  To provide adequate assurance of payment for future services Utility Services, the Debtors propose to deposit a sum equal to fifty percent (50%) of the Debtors' estimated monthly cost of Utility Services into an interest-bearing, newly created segregated account on or before thirty (30) days after the Petition Date.  If any Utility Provider believes additional adequate

assurance is required, they may request such additional assurance pursuant to the procedures set forth in the Utility Providers Motion.

**F.** **Cash Collateral Motion**

114.    Through the Emergency Motion of the Debtors Pursuant to Sections 105(a), 361, 363 and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Entry of Interim and Final Orders (a) Authorizing Use of Cash Collateral; (b) Granting Adequate Protection; and (c) Scheduling a Final Hearing on the Motion (the "**Cash Collateral Motion**"), the Debtors seek authority to utilize their cash in the ordinary course of their business notwithstanding the liens held by the SVBF and the PBGC.

115.    It is essential to the Debtors' efforts to maintain the going concern value of their estates to make use of all cash on-hand and cash derived from operating the Debtors' businesses claimed as collateral (the "**Cash Collateral**") by the SVBF and the PBGC (the "**Secured Creditors**"). The Debtors will utilize Cash Collateral only to pay for expenses that are set forth in the cash collateral budget, attached as Exhibit A to the proposed interim order granting the Cash Collateral Motion (the "**Cash Collateral Budget**"), which are related to operating the Debtors' business and the costs of administering these Bankruptcy Cases.   Such expenses include, but are not limited to, employee payroll and other benefits, raw material acquisition costs, transportation and logistics costs, and other expenses related to operating the business, as well as the compensations of retained professionals and other costs attendant to the Chapter 11 process.

116.    It is imperative that the Debtors be authorized to utilize the Cash Collateral on a cumulative basis in the aggregate amounts and for the purposes set forth in the Cash Collateral Budget; provided, that, the Debtors may exceed the aggregate and line item amounts in the

Budget by 10% without the need for further Court order or consent of the Secured Creditors.

117. I, and the Debtors' senior management, believe that the debt owed to the Secured Creditors (the "**Secured Debt**") is substantially oversecured by the Collateral. As set forth above and in the Cash Collateral Motion, as of the Petition Date, the total amount outstanding to SVBF was approximately $2.5 million and the alleged amount owed to the PBGC on which account of which it has filed liens against the Debtors is no more than $7 million.

118. The Debtors' unaudited condensed consolidated financial statements reflected assets with a book value of more than $32 million, as of September 30, 2010, which value far exceeds the amount of the Secured Debt. These assets include total accounts receivable of nearly $13 million, approximately $9.2 million of which was owed to the Debtors either directly by the United States Government or from prime contractors to the United States Government. In addition to significant accounts receivable, the Debtors also had net inventory on hand of over $6.6 million and property, plant and equipment, net of accumulated depreciation and amortization of $9.695 million.

119. Based upon these assets, and their estimated net liquidation value, I, and the Debtors' senior management, believe that a significant equity cushion exists to protect the Secured Creditors' interest in the Collateral. Additionally, the Secured Creditors will be provided with post-petition replacement liens (the "**Replacement Liens**"), and SVBF will receive the following adequate protection: (a) payment, at the non-default contract rate of interest, of interest payable in arrears from the Petition Date, 30 days after the Petition Date, (b) the accrual of the difference between default interest and non-default interest (a difference of 2%); and (c) after entry of an Interim Order, attorneys' fees of $11,000 plus a $15,000 advanced payment for anticipated attorneys' fees (the "**Adequate Protection Payments**").

### G. **Motion to Retain ALCS as Claims and Noticing Agent.**

120.    In the Debtors' Motion for an Order Appointing American Legal Claim Services, LLC as Claims, Noticing and Balloting Agent (the "**Motion to Retain ALCS**"), the Debtors seek authority to retain American Legal Claim Services, LLC ("**ALCS**") as their noticing agent and claims processor based on the terms and conditions set forth in that certain services agreement dated February 10, 2011 (the "**ALCS Agreement**").

121.    I have reviewed and approved the ALCS Agreement filed with the Debtors' Motion to Retail ALCS.  Given the nature of the Debtors' business and the number of creditors and parties in interest involved, the Debtors expect thousands of claims.  As a result of the Debtors' limited staffing and the cost benefit of having claims administration and notice matters handled by someone other than counsel, I and the Debtors' management believe it would be in the best interest of the estates to utilize the services of an experienced claims processor such as ALCS.

122.    I and the Debtors' management consulted with the Debtors' legal and financial advisors and determined that based on the size, scope, and geography of the Bankruptcy Cases, ALCS was the appropriate choice.  Additionally, given prior relationships from other matters, the Debtors' advisors were also able to secure extremely competitive pricing from ALCS for these services.

123.    ALCS was founded and is operated by experienced claims and noticing professionals and its employees have been involved in numerous large Chapter 11 cases, before this Court and throughout the country.  I and the Debtors' management believe, in our business judgment, that ALCS has the necessary experience and expertise to render the necessary services in a professional and efficient manner in accordance with the Bankruptcy Rules and Local

Bankruptcy Rules. The Debtors believe that the proposed compensation to ALCS is fair and reasonable.

## VIII. CONCLUSION

124. I hereby certify that the foregoing statements are true and correct to the best of my knowledge information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

Dated: February 15, 2011
      Birmingham, Alamama

By:     Randall C. Shealy

Title:     Senior Vice President and Chief Financial Officer, Alabama Aircraft Industries, Inc.;

             Chief Financial Officer and Treasurer, Alabama Aircraft Industries, Inc.—Birmingham;

             Chief Financial Officer and Treasurer of Pemco Aircraft Engineering Services, Inc.